# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

1BIOLOGIC, LLC
A Michigan Limited Liability Company,

         Plaintiff,

v.

GTM PARTNERS LLC, D/B/A ARSENAL
SOLUTIONS GROUP, LLC, a Wyoming
company; ZSB VENTURES, INC., an
Illinois company; TOTAL MED GROUP,
an Illinois company; KB MEDICAL
MANAGEMENT LLC, an Illinois
company; SAMI BAIG, an Illinois
individual, and JOSHUA
QUINSENBERRY, a Texas individual;

         Defendants.

_____/

Civil Action No.

Hon.

Mag.

**DEMAND FOR JURY TRIAL**

Sara K. MacWilliams (P67805)
Derek T. Howard (P69625)
Paige A. Serra (P84568)
**DOERR MACWILLIAMS
HOWARD PLLC**
*Attorney for Plaintiff*
3883 Telegraph Suite 203
Bloomfield Hills, MI 48302
(248) 432-1586
sara@dmhlawyers.com
derek@dmhlawyers.com
paige@dmhlawyers.com

_____/

## PLAINTIFF 1BIOLOGIC, LLC'S COMPLAINT AND JURY DEMAND

Plaintiff 1Biologic, LLC, by and through its attorneys Doerr MacWilliams Howard PLLC, for its Complaint against GTM Partners, LLC d/b/a Arsenal Group LLC, ZSB Ventures, Inc., Total Med Group, KB Medical Management, LLC, Sami Baig, and Joshua Quinsenberry, as follows:

## PARTIES, JURISDICTION AND VENUE

1.      1 Biologic, LLC ("Plaintiff") is a Michigan limited liability company based in Troy, Michigan.

2.      Defendant GTM Partners, LLC d/b/a Arsenal Group LLC ("Arsenal") is a Wyoming limited liability company with a principal place of business located in Texas.

3.      Defendant ZSB Ventures, Inc. is an Illinois company with a principal place of business located in Lombard, Illinois.

4.      Defendant Total Med Group is an Illinois company with a principal place of business located in Oak Lawn, Illinois.

5.      KB Medical Management, LLC, is an Illinois limited liability company with a principal place of business located in Lombard, Illinois.

6.      Defendant Sami Baig ("Baig") is an Illinois individual with a principal place of business in Oak Lawn, Illinois.

2

7.     Defendant Joshua Quinsenberry ("Quinsenberry") is a Texas individual that serves as the Managing Partner for Arsenal. His principal place of business is located at 30 N. Gould St., Suite R, Sheridan, WY 82801.

8.     This matter is properly filed in this Court pursuant to 28 USC § 1332(a)(1), because the amount in controversy exceeds $75,000 and the action is between citizens and entities of different states.

9.     Venue is proper in this Court because the applicable contract was entered into, and the services performed in, this judicial district. 28 USC § 1391(2).

## GENERAL ALLEGATIONS

10.    1Biologic is a specialized healthcare company that represents manufacturers specializing in cutting-edge technology and innovative solutions, including amniotic membranes. It is known for high quality, rigorous compliance standards, and exceptional patient outcomes.

11.    On or about May 22, 2025, 1Biologic signed an Independent Contractor Agreement ("ICA") with Defendant Arsenal, whereby Arsenal retained 1Biologic as a sales and marketing representative for a set commission schedule of 50 percent. (**Ex. 1**, Arsenal Contract).

12.    The ICA was critical to 1Biologic in making it safe to share customer relationships and business contacts with Defendants because it ensured 1Biologic would receive compensation for sharing its resources and leads.

13.     Pursuant to the ICA, the parties worked closely in developing new business for Arsenal's benefit.

14.     Quisenberry runs Arsenal as the sole member and manager.

15.     Baig was introduced to 1Biologic by his business partners and associates in Michigan. It was represented that he maintained an extensive network of business contacts in the Chicago area and throughout various regions of the country.

16.     Baig owns and/or is affiliated with the various Illinois entity Defendants and at various times instructed 1Biologic to pay his LLCs funds that were otherwise being paid to him.

17.     At various points during his business relationship with 1Biologic, Baig has worked through ZSB Ventures, Inc., Total Med Group, and KB Medical Management LLC. All of these entities have profited and benefited from the business managed by 1Biologic.

18.     At the time 1Biologic entered into a business relationship with Baig, the business plan was that 1Biologic would be responsible for managing all backend functions, including compliance, onboarding, staffing, and operational support related to his sales, while he brought in the business.

19.     After 1Biologic's business relationship was in place with Arsenal, Baig was introduced to Quisenberry by 1Biologic following representations by

Quisenberry that he had a significant account forthcoming and required 1Biologic's support to manage and service it effectively.

20.     In June 2025, 1Biologic's team was in Chicago, Illinois attending to customer relationships; specifically, Baig accounts.

21.     Baig and his businesses (ZSB Ventures, Inc., Total Med Group and KB Medical Management LLC) benefited from 1Biologic's services in Chicago.

22.     Unbeknownst to Quisenberry, during the June 2025 trip to Chicago to visit Baig and his clients, the principals of 1Biologic were present in the vehicle with Baig at the time Quisenberry placed a telephone call to Baig mobile phone. 1Biologic's principals clearly overheard the caller's voice during the conversation and recognized it as Quisenberry speaking.

23.     While Baig was still on the call with Quisenberry, Glenna Bryan of 1Biologic, who was seated in the back seat of the vehicle, sent Quisenberry a text message stating that 1Biologic's team was with Baig at that time. Quisenberry appeared surprised upon learning that they were present in the vehicle during the call.

24.     After the call concluded, Baig informed 1Biologic that Quisenberry had instructed him about 1Biologic, "Don't work with those two girls. You don't need them. Work directly with me," and expressly requested that 1Biologic not disclose the substance of the conversation to Quisenberry.

25.     Baig reassured 1Biologic's principals that he had no interest in Quisenberry's offer and asked that the matter not be raised with Quisenberry, while expressing uncertainty as to why such a comment would have been made. 1Biologic believed at the time, falsely in retrospect, that Baig was acting in good faith.

26.     At the time, 1Biologic believed Baig would not pursue Quisenberry's offer and otherwise trusted Baig.

27.     When 1Biologic first started working with Baig, Baig was engaged as an independent contractor for 1Biologic through ZSB Ventures and compensated accordingly.

28.     However, Baig suddenly demanded a total of $34,000 in additional payments arising from his dispute with the third-party group that originally introduced him to 1Biologic and otherwise threatened to disrupt pending deals which 1Biologic had already invested into.

29.     Thus, in order to protect pending transactions that 1Biologic had already substantially funded and developed, 1Biologic advanced $17,000 to Baig—representing one-half of the amount he demanded—as a good-faith accommodation, despite the fact that the majority of any such payment obligation properly rested with his introducing partners, who were receiving the largest revenue share under the written commission allocations. Baig agreed to this accommodation.

30.     1Biologic and Baig further agreed that 1Biologic would reconcile and satisfy any legitimate remaining balance once 1Biologic received the full 5% override participation owed to it on all transactions to date, including payment from existing accounts already on the books that had been developed and supported through 1Biologic's backend operational work.

31.     Quisenberry promoted the idea of this solution that reassured 1Biologic that he, and Arsenal, would ensure 1Biologic's investment was not in vain.

32.     Baig and Quisenberry claimed to 1Biologic that this change in terms would ensure that Baig kept working the accounts to the benefit of all parties.

33.     1Biologic then hired additional backend staff to support Baig's accounts, all in reliance on the fact that Baig was not secretly working with Quisenberry and Arsenal to cut out 1Biologic.

34.     The change in terms for Baig and TotalMed Group was confirmed via a September 29, 2025 email, whereby the total 50 percent commission for sales was to be split going forward with 45 percent to Baig and/or Total Med Group (Baig's company) and a 5 percent override to 1Biologic. Arsenal, via email, was also included in this arrangement. (**Ex. 2**, 9.29.25 email from Baig to Bryan et al).

35.    1Biologic's costs to support Baig and his business interests were substantial and all incurred in reliance on the fact that the revised commission structure would be honored.

36.    1Biologic substantially scaled up their staff and business to support the business that Defendants claimed the business relationship would support.

37.    Unbeknownst to 1Biologic at the time, however, Quisenberry, for himself and on behalf of Arsenal, and Baig, for himself and through entities, were secretly plotting to simply leave the costs on 1Biologic and seize even more of the profits for themselves.

38.    In fact, in June of 2025, Arsenal secretively revoked 1Biologic's access to the Smartsheet sales tracker data and related internal systems used to track patients, invoices, and commissions.

39.    Arsenal removed this access for the same reason parties always avoid transparency: to hide its activities in blatantly violating in the ICA, including the proposed modified term, and otherwise try to cover its tracks.

40.    Not long after the September 2025 modification to the ICA, 1Biologic was shut out of its commission payments by Arsenal altogether, including outstanding payments through Altera.

41.    1Biologic's access to records of key accounts then ceased. Defendants further tried to hide their tracks by claiming grafts associated with those

transactions had allegedly been returned months later—an assertion that made no sense as 1Biologic's team was responsible for processing, tracking, and reconciling the orders and returns.

42.     Defendants even tried to bully 1Biologic out of filing suit by claiming 1Biologic owed Baig and/or his companies more money, despite 1Biologic having funded his deals and not being paid for the work or even their travel costs to support Defendants' accounts.

43.     On December 30, 2025, Baig boldly emailed Arsenal's accounting team purporting to unilaterally cut off 1Biologic's right to any commissions whatsoever, which he had no authority to do on behalf of 1Biologic, and through such unilateral action he seized the commissions due to 1Biologic.

44.     Arsenal's reliance on this communication, which Quisenberry and Arsenal knew or should have known was improper and unsupported by the agreements, is also problematic.

45.     To date, 1Biologic is owed hundreds of thousands of dollars in outstanding commissions for work it performed and reimbursement for costs incurred based on the expectation it would receive commissions for all sales executed pursuant to the ICA.

<u>**COUNT I**</u>
**<u>BREACH OF CONTRACT—ICA AGREEMENT</u>**
**<u>(Arsenal and Quisenberry)</u>**

34.     1Biologic realleges all prior allegations as though set forth herein. To the extent the following allegations conflict with the prior allegations, the following are stated in the alternative.

35.     The ICA (**Ex. 1**) is a binding contract between Arsenal and 1Biologic.

36.     Quisenberry owns and runs Arsenal and agreed to ensure the ICA was honored.

37.     By contract, Arsenal agreed 1Biologic would receive 50 percent commissions on assigned accounts.

38.     1Biologic funded the sales and otherwise performed its services under the ICA as agreed.

39.     Without justification, Arsenal acted to withhold the commissions due under the ICA, constituting a breach by Arsenal, and Quisenberry as the sole member and manager with authority to make such decisions.

40.     Without justification, Arsenal and Quisenberry tried to hide the breach by revoking access to the SmartSheet and sales data.

41.     As a direct and proximate result of the breach of the ICA by Arsenal and Quisenberry, 1Biologic has been damaged.

WHEREFORE, 1Biologic respectfully requests that this Court enter a judgment in its favor and against Arsenal and Quisenberry in an amount to be determined at trial and for other and further relief as this Court deems just.

## COUNT II
## BREACH OF CONTRACT—AMENDED COMMISSION AGREEMENT
## (All Defendants)

42.   1Biologic realleges all prior allegations as though set forth herein. To the extent the following allegations conflict with the prior allegations, the following are stated in the alternative.

43.   The Amended Commission Agreement (**Ex. 2**) is a binding contract.

44.   By contract, all Defendants agreed to pay 1Biologic commissions on assigned accounts at an override rate of 5 percent.

45.   1Biologic funded costs, invested in the sales, and otherwise performed its services under the amended commission agreement as agreed and otherwise performed all obligations under amended commission agreement.

46.   Without justification, the Defendants worked together to withhold the commissions due to 1Biologic under the amended commission agreement, constituting a breach of the agreement.

47.   As a direct and proximate result of such breach, 1Biologic has been damaged.

WHEREFORE, 1Biologic respectfully requests that this Court enter a judgment in its favor and against all Defendants in an amount to be determined at trial and for other and further relief as this Court deems just.

## COUNT III
## UNJUST ENRICHMENT
### (All Defendants)

48.     1Biologic realleges all prior allegations as though set forth herein. To the extent the following allegations conflict with the prior allegations, the following are stated in the alternative.

49.     As a result of the conduct set forth in this Complaint, each of the Defendants have been unjustly enriched at 1Biologic's expense.

50.     Specifically, the Defendants received the benefit of 1Biologic's connections, investment, supplies, and work and failed to compensate 1Biologic for the same.

51.     Permitting Defendants to retain such significant financial benefits without compensation to 1Biologic would represent an inequity.

52.     To the extent the ICA is not enforceable, and to the extent Defendants are not parties to such ICA, the Court should imply a contract requiring Defendants to pay the commissions that the parties contemplated would be paid to 1Biologic in order to avoid an inequity.

WHEREFORE, 1Biologic respectfully requests that this Court enter a judgment in its favor and against all Defendants in an amount to be determined at trial and for other and further relief as this Court deems just.

## COUNT IV
## TORTIOUS INTERFERENCE
### (Baig, ZSB Ventures, Inc., Total Med Group, KB Medical Management LLC)

53.    1Biologic realleges all prior allegations as though set forth herein. To the extent the following allegations conflict with the prior allegations, the following are stated in the alternative.

54.    The ICA and amended commission agreement were valid contracts which required Arsenal to make commission payments to 1Biologic.

55.    Baig, ZSB Ventures, Inc., Total Med Group and KB Medical Management LLC knew of such contractual agreements.

56.    Baig, ZSB Ventures, Inc., Total Med Group and KB Medical Management LLC unjustly induced a breach of 1Biologic's commission agreements, as originally agreed and as amended, going so far as to email Arsenal's accounting team to terminate the 5% commission.

57.    Baig, ZSB Ventures, Inc., Total Med Group and KB Medical Management LLC interference was malicious and unjustified.

58.    As a direct and proximate result of such tortious interference, 1Biologic has been damaged.

**COUNT V**
**FRAUDULENT INDUCEMENT OF AMENDED COMMISSION**
**AGREEMENT**
**(All Defendants)**

59.    1Biologic realleges all prior allegations as though set forth herein. To the extent the following allegations conflict with the prior allegations, the following are stated in the alternative.

60.    The Amended Commission Agreement (**Ex. 2**) reduced 1Biologic's right to 50 percent commissions to a total of 5 percent as an "override" commission.

61.    In order to induce 1Biologic to agree to permit Baig to enter into a direct agreement with Arsenal and otherwise release their right to a full 50 percent commission, Baig, on behalf of himself and his various entities (ZSB Ventures, Inc., Total Med Group and KB Medical Management LLC), represented:

(a) That the amended structure would save pending deals for 1Biologic which 1Biologic had already invested in.

(b) That Baig would not circumvent 1Biologic and enter into a direct relationship with Quisenberry or Arsenal at any time.

(c) That 1Biologic would be able to recoup its direct payment to Baig and funding of his sales costs through its override commissions.

(d) That in the event 1Biologic agreed to the amended structure, specific deals would be closed with 1Biologic receiving its commissions.

62.    Baig (on behalf of himself and his entities) made such material misrepresentations of fact under circumstances such that it would reasonably be expected that 1Biologic would rely on such statements.

63.    Baig, on behalf of himself and his entities, made the false statements in order to hide this lack of good faith and keep 1Biologic distracted while they fomented a plan to steal the commissions that 1Biologic had invested substantial resources towards.

64.    Baig and his entities made the false statements with knowledge that the statements were false or made those statements recklessly, without knowledge of the truth and as positive assertions.

65.    1Biologic acted in reliance on the false statements by agreeing to cut its commissions.

66.    Had 1Biologic known the truth of Baig and his entities' actual intent and plans, it would not have agreed to an amended commission structure.

67.    As a direct and proximate result of Baig and his entities' fraudulent statements, 1Biologic has been damaged.

WHEREFORE, 1Biologic respectfully requests that this Court enter a judgment in its favor and against Arsenal, Quisenberry, Baig, ZSB Ventures, Inc., Total Med Group and KB Medical Management LLC in an amount to be determined at trial and for other and further relief as this Court deems just.

Respectfully submitted,

**DOERR MACWILLIAMS HOWARD PLLC**

By:   */s/ Sara K. MacWilliams*
*/s/ Derek T. Howard*
*/s/ Paige A. Serra*
Sara K. MacWilliams (P67805)
Derek T. Howard (P69625)
Paige A. Serra (P84568)
3883 Telegraph Road, Suite 203
Bloomfield Hills, MI 48302
(248) 432-1586
sara@dmhlawyers.com
derek@dmhlawyers.com
paige@dmhlawyers.com

Dated: March 10, 2026

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

1BIOLOGIC, LLC
A Michigan Limited Liability Company,

          Plaintiff,                        Civil Action No.

v.                                    Hon.

GTM PARTNERS LLC, D/B/A ARSENAL
SOLUTIONS GROUP, LLC, a Wyoming
company; ZSB VENTURES, INC., an
Illinois company; TOTAL MED GROUP,
an Illinois company; KB MEDICAL
MANAGEMENT LLC, an Illinois
company; SAMI BAIG, an Illinois
individual, and JOSHUA
QUINSENBERRY, a Texas individual;

          Mag.

**DEMAND FOR JURY TRIAL**

          Defendants.

_____/

Sara K. MacWilliams (P67805)
Derek T. Howard (P6925)
Paige A. Serra (P84568)
**DOERR MACWILLIAMS
HOWARD PLLC**
*Attorney for Plaintiff*
3883 Telegraph Suite 203
Bloomfield Hills, MI 48302
(248) 432-1586
sara@dmhlawyers.com
derek@dmhlawyers.com
paige@dmhlawyers.com

_____/

<u>**PLAINTIFF 1BIOLOGIC, LLC'S JURY DEMAND**</u>

Plaintiff 1Biologic, LLC, by and through its attorneys Doerr MacWilliams Howard PLLC, pursuant to Local Rule 9.1(a), demand a jury trial for all issues so triable.

Respectfully submitted,

**DOERR MACWILLIAMS HOWARD PLLC**

By:  */s/ Sara K. MacWilliams*
*/s/ Derek T. Howard*
*/s/ Paige A. Serra*
Sara K. MacWilliams (P67805)
Derek T. Howard (P69625)
Paige A. Serra (P84568)
3883 Telegraph Road, Suite 203
Bloomfield Hills, MI 48302
(248) 432-1586
sara@dmhlawyers.com
derek@dmhlawyers.com
paige@dmhlawyers.com

Dated: March 10, 2026

## <u>INDEX OF EXHIBITS</u>

1. Independent Contractor Agreement

2. Amended Contractor Agreement

# **EXHIBIT 1**

**Independent Contractor Agreement**



## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (the "Agreement") is entered into this 05 / 22 / 2025 by and between 1 Biologic (the "Sales/Marketing Representative"), located at 888 W Big Beaver Rd Suite 200 Troy MI 48084, for himself and his heirs, executors, administrators, related entities and assigns and Arsenal Solutions.

WHEREAS, Arsenal Solutions is in need of a Sales/Marketing Representative to market and sell its products and services on an as needed basis; and

WHEREAS, Sales/Marketing Representative has agreed to market and sell its products and services for Arsenal Solutions on an as needed basis;

NOW, THEREFORE, the parties hereby agree as follows:

**1. Sales/Marketing Representative Services.** Sales/Marketing Representative shall be available and shall provide to Arsenal Solutions professional sales and marketing services ("Services") as needed and requested.

**2. Consideration.**

**A. Rate.** In consideration of the Services to be performed by Sales/Marketing Representative under this Agreement Arsenal Solutions will pay Sales/Marketing Representative a commission rate as set forth in the attached Commission Schedule identified as Exhibit "A" attached to this Agreement. Arsenal Solutions shall pay Sales/Marketing Representative the amounts due within fourteen (14) days of the representative's submission of commission invoices and approval by Arsenal Solutions.

**B. Expenses.** Arsenal Solutions will not pay Sales/Marketing Representative for any expenses including but not limited to as travel expenses, meal expenses, administrative expenses, lodging expenses, or any other miscellaneous expenses incurred while this Agreement between Sales/Marketing Representative and Arsenal Solutions exists.

**3. Independent Contractor.** Nothing contained herein or any document executed in connection herewith, shall be construed to create an employer-employee partnership or joint venture relationship between Arsenal Solutions and Sales/Marketing Representative. Sales/Marketing Representative is an independent contractor and not an employee of Arsenal Solutions or any of its subsidiaries or affiliates. The consideration set forth in Section 2 shall be the sole consideration due Sales/Marketing Representative for the services rendered hereunder. It is understood that Arsenal Solutions will not withhold any amounts for payment of taxes from the compensation of Sales/Marketing Representative hereunder. Sales/Marketing Representative will not represent to be or hold itself out as an employee of Arsenal Solutions and Sales/Marketing Representative acknowledges that he/she shall not have the right or entitlement in or to any of the pension, retirement or other benefit programs now or hereafter available to regular employees. Any and all sums subject to deductions, if any, required to be withheld and/or paid under any applicable state, federal or municipal laws or union or professional guild regulations shall be Sales/Marketing Representative's sole responsibility and Sales/Marketing Representative shall indemnify and hold Arsenal Solutions harmless from any and all damages, claims and expenses arising out of or resulting from any claims asserted by any taxing authority as a result of or in connection with said payments. Sales/Marketing Representative will provide itself with all equipment necessary to perform the Services contemplated by this



Doc ID: 5252d3092b5e551fb5c486e8df6a7505600860ae



Agreement. Sales/Marketing Representative has the right to perform services for any other person or entity, subject to the confidentiality provisions of this Agreement.

**4. Confidentiality.** In the course of performing Services, the parties recognize that Sales/Marketing Representative may come in contact or become familiar with information which Arsenal Solutions or its subsidiaries or affiliates may consider confidential. This information may include, but is not limited to, information of any kind, nature, or description concerning any matters affecting or relating to Sales/Marketing Representative's services for Arsenal Solutions, the business or operations of Arsenal Solutions, including compensation data, and/or the products, processes, or other data of Arsenal Solutions which information may be of value to a competitor. Sales/Marketing Representative agrees to keep all such information confidential and not to discuss or divulge it to anyone other than appropriate Arsenal Solutions personnel or their designees.

**5. Term.** This Agreement shall commence on date above. Sales/Marketing Representative may terminate this Agreement upon Thirty (30) days prior written notice. Arsenal Solutions may terminate this Agreement at any time.  At the discretion of Arsenal Solutions, this Agreement may serve as a contract-to-hire arrangement, wherein if Arsenal Solutions decides to convert the independent contractor to an employee, a separate employment agreement will be provided outlining the terms and conditions of employment, and this decision to transition from independent contractor to employee status will be communicated in writing to the Sales/Marketing Representative.

**6. Sales/Marketing Representative's Taxpayer I.D. Number.** The taxpayer I.D. number of the Sales/Marketing Representative is ___995074248___ (Sales/Marketing Representative Social Security Number).

**7. Insurance.** The Sales/Marketing Representative agrees to carry any necessary general liability, automobile liability, workers' compensation and employer's liability insurance. In the event the Sales/ Marketing Representative fails to carry such insurance he/she shall indemnify and hold harmless Arsenal Solutions, its agents and employees from and against any damages, claims, and expenses arising out of or resulting from work conducted by Sales/Marketing Representative and its agents or employees.

**8. Competent Work.** All work will be done in a competent fashion in accordance with applicable standards, and all services are subject to final approval by a representative of Arsenal Solutions prior to payment.

**9. Representations and Warranties.** The Sales/Marketing Representative will make no representations, warranties, or commitments binding Arsenal Solutions without its prior consent.

**10.   Legal Right**. Sales/Marketing Representative covenants and warrants that he/she has the unlimited legal right to enter into this Agreement and to perform in accordance with its terms without violating the rights of others or any applicable law and that he/she has not and shall not become a party to any other agreement of any kind which conflicts with this Agreement. Sales/Marketing Representative shall indemnify and hold harmless Arsenal Solutions from any and all damages, claims and expenses arising out of or resulting from any claim that this Agreement violates any such agreements. Breach of this warranty shall operate to terminate this Agreement automatically without notice as specified in Paragraph 5 and to terminate all obligations of Arsenal Solutions to pay any amounts which remain unpaid under this Agreement.

**11.   Waiver**. Failure to invoke any right, condition, or covenant in this Agreement by either party shall not be deemed to imply or constitute a waiver of any rights, condition, or covenant and neither party may rely on such failure.

Doc ID: 5252d3092b5e551fb5c486e8df6a7505600860ae



**12. Notice**. Any notice or communication permitted or required by this Agreement shall be deemed effective when personally delivered or deposited, postage prepaid, in the first-class mail of the United States properly addressed to the appropriate party at the address set forth below:

Notices as to Sales/Marketing Representative:
(address): _____

Notices to Arsenal Solutions:
30 N Gould st Suite R Sheridan, Wyoming 82801

**13. Enforceability.** If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, the reminder of the Agreement shall remain in full force and effect and shall in no way be impaired.

**14. Miscellaneous.**
    a. Entire Agreement and Amendments. This Agreement constitutes the entire agreement of the parties regarding the subject matter hereof, and replaces and supersedes all other agreements or understandings, whether written or oral. No amendment or extension of this Agreement shall be binding unless in writing and signed by both parties.

    b. Binding Effect, Assignment. This Agreement shall be binding upon and shall inure to the benefit of Sales/Marketing Representative and the Arsenal Solutions and its successors and assigns. Nothing in this Agreement shall be construed to permit the assignment by Sales/Marketing Representative of

any of its rights or obligations hereunder, and such assignment is expressly prohibited without the prior written consent of Arsenal Solutions.
    c. Governing Law, Severability. This Agreement shall be governed by the laws of the Commonwealth of Texas. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

WHEREFORE, the parties have executed this Agreement as of the date written above. This agreement must be returned within 3 days of date above.

| Arsenal Solutions | Sales/Marketing Representative |
|---|---|
| *Joshua Quisenberry*<br>_____ | _____ |
| Partner | _Bridget_____ (Name) |
| Date: ___05 / 22 / 2025____ | Date: ____05 / 22 / 2025_____ |



Doc ID: 5252d3092b5e551fb5c486e8df6a7505600860ae



# EXHIBIT A

**Payment Frequency:**

Arsenal Solutions pays independent contractors commission once a month.

Payments are made within 5-10 days of the first of each month.

Monthly Recurring Payments will be made to the Independent Contractors for their assigned accounts.

**Compensation Determination:**

Compensation is discussed and determined on a per-account basis between Arsenal Solutions and the independent contractor.

**Commission Structure:**

The independent contractor will receive commission only on their assigned accounts.

Commission is paid on paid sales in the following calendar month.

Commission rate: __50__%.

| Arsenal Solutions | Sales/Marketing Representative |
|---|---|
| *Joshua Quisenberry* | |
| Partner | __Bridget_____(Name) |
| Date: ____05 / 22 / 2025____ | Date: ____05 / 22 / 2025____ |



Doc ID: 5252d3092b5e551fb5c486e8df6a7505600860ae

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Arsenal_ICA_Agreement_Bridget |
| **File name** | Arsenal Solutions_ICA.pdf and 1 other |
| **Document ID** | 5252d3092b5e551fb5c486e8df6a7505600860ae |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **05 / 22 / 2025**<br>15:57:40 UTC-4 | Sent for signature to Joshua Quisenberry (josh@arsenalsolutionsgroup.com) and Bridget (Bridget@1biologic.com) from sam@arsenalsolutionsgroup.com<br>IP: 108.247.48.207 |
| VIEWED | **05 / 22 / 2025**<br>15:58:05 UTC-4 | Viewed by Joshua Quisenberry (josh@arsenalsolutionsgroup.com)<br>IP: 57.132.195.238 |
| SIGNED | **05 / 22 / 2025**<br>15:58:22 UTC-4 | Signed by Joshua Quisenberry (josh@arsenalsolutionsgroup.com)<br>IP: 57.132.195.238 |
| VIEWED | **05 / 22 / 2025**<br>16:14:39 UTC-4 | Viewed by Bridget (bridget@1biologic.com)<br>IP: 71.233.184.248 |
| SIGNED | **05 / 22 / 2025**<br>16:37:53 UTC-4 | Signed by Bridget (bridget@1biologic.com)<br>IP: 71.233.184.248 |
| COMPLETED | **05 / 22 / 2025**<br>16:37:53 UTC-4 | The document has been completed. |

# **EXHIBIT 2**

**Amended Contractor Agreement**

 Outlook

---

## Commission Structure Confirmation

| | |
|---|---|
| **From** | Sami Baig <sami@totalmedgroup.com> |
| **Date** | Mon 9/29/2025 5:51 PM |
| **To** | Glenna Bryan <glenna@1biologic.com>; Bridget <Bridget@1biologic.com>; josh@arsenalsolutionsgroup.com <josh@arsenalsolutionsgroup.com> |

Hi Josh,

Hope you're well. I wanted to recap our agreement to ensure we're aligned. TotalMed Group (Sami) is signed directly under your company, Arsenal Solutions/Total Surgical. At my request, 1Biologic (Glenna/Bridget) will receive a 5% override, and TotalMed Group will receive a 45% commission on our production.

Summary:

- **Total commission: 50%**
- **Paid directly to 1Biologic (override): 5%**
- **Paid to TotalMed Group: 45%**

Please reply to confirm this breakdown. Thank you!

Best Regards,

**Sami Baig**
**Chief Executive Officer**



5533 W. 109th St. Ste 103 | Oak Lawn, IL 60453
D: 708.691.3346

CONFIDENTIALITY NOTICE: The information in this e-mail message and any attachment is intended solely for the party to whom it is addressed and may contain confidential and privileged information. Any unauthorized use, disclosure or distribution is prohibited. If you are the intended recipient, please notify the sender by e-mail and destroy all copies of this communication.